**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0880-18

ANA PEREIRA,

    Plaintiff-Appellant,

v.

MICHAEL P. ESPOSITO, M.D.,
EMERGENCY MEDICAL
ASSOCIATES OF NEW JERSEY,
P.A., JAMES MARTIN, M.D.,
NEW JERSEY CENTER FOR
PROSTATE CANCER AND
UROLOGY, P.C., MARGARET
H. ENG, M.D., HARALD
PETERSON, M.D., GOLDA
FERNANDEZ, M.D., EVGENIYA
SOKOLOVSKAYA, D.O.,
GENEVIEVE FERNANDES, M.D.,
DOUGLAS LIVORNESE, M.D.,
KAWSER AHMED, M.D., ILAN
WALDMAN, M.D., JEFFREY
OSOFSKY, M.D., KRITI SHARMA,
M.D.; MAUREEN TUMOLO, M.D.,
WARREN M. WALKOW, M.D.,
ANDREW LEE, M.D., RICHARD DU,
M.D., ERNEST GINALIS, M.D., ALAN
B. HARATZ, M.D., MICHAEL
KLODNICKI, M.D., PETER PARK,
M.D., N. PATEL, M.D., SARJBIT

SINGH SANDHU, M.D., EWA BIALA, R.N., JACQUELINE PALMIERI, R.N., MARIA DALENA, R.N., SHIAMEKA DAVILA, R.N., WALTER JANECZEK, R.N., CHRISTINE KELLY, R.N., OKSANA USOVA, R.N.; P. AGUIRE, R.N., PAMELA ALLEYNE, R.N., EILEEN ALPAUGH, R.N., BILAL BAJWA, R.N., MARIA BAYONA, R.N., TULLIO CARFAGNO, R.N.; TEMIRA CHASTAIN, R.N., STEPHANIE COLLINS, R.N., MARSHALL CULVER, R.N.; DEBORAH DANCEY, R.N., NORIAN DEAN, R.N., ANN DELEON, R.N., MARIANNE DONAHUE, R.N., GENIENNE ELZIE, R.N., SUZANNE FORGACH, R.N., NORMA HAYASHI, R.N., MICHELLE JONIAK, R.N., PLAMEN KOSSEV, R.N., CORINNE LACHAC, R.N., TAMARA LASHENKO, R.N., MARY MAGOVERN, R.N., VANESSA MARCELLE, R.N., LINETTE MARTIN, R.N., GAYLE MARY, R.N., VICKEY MCMAHON, R.N., EDUARDO NICOLAS, R.N., TERESITA NICOLAS, R.N., VELMA OGHOGHOMEH, R.N., MAYRA PENAGOS, R.N., SUSAN POCHOS, R.N., COURTNEY REA, R.N., JENNIFER SMALL, R.N., TIMOTHY SPERLING, R.N., HUMBERTO TORRAO, R.N., DEBORAH ULIANO, R.N.; ALICE WALSH, R.N., and MONMOUTH MEDICAL CENTER,

     Defendants,

and

VIOLET E. KRAMER, M.D.,

Defendant-Respondent.

_____

Argued October 21, 2020 – Decided December 2, 2021

Before Judges Fuentes, Whipple, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1397-12.

Bruce H. Nagel argued the cause for appellant (Nagel Rice, LLP, attorneys; Bruce H. Nagel, of counsel and on the brief; Susan Fetten Connors and Zachary A. Goldman, on the brief).

James A. Vasios argued the cause for respondent (Vasios, Kelly and Strollo, PA, attorneys; James A. Vasios, of counsel; Robert J. Logan, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This case originated as a medical malpractice action brought by plaintiff Ana Pereira against Monmouth Medical Center and the physicians and medical support staff who treated her for an impacted kidney stone, kidney infection, sepsis, and ultimately septic shock. Plaintiff settled her claims against all relevant defendants except Dr. Violet E. Kramer, the hospital's critical care specialist assigned to the intensive care unit (ICU). Dr. Kramer was the only defendant when this case came to trial before a civil jury.

 A-0880-18

The jury found Dr. Kramer did not deviate from the standard of care in her treatment of plaintiff's medical condition. Judge Mara Zazzali-Hogan presided over the trial and entered a judgment of no cause of action in favor of Dr. Kramer. Judge Zazzali-Hogan found no legal or factual basis to disturb the jury's verdict and denied plaintiff's post-trial motions for a judgment notwithstanding the verdict (JNOV) or alternatively for a new trial. The judge explained her rulings in a comprehensive memorandum of opinion.

On appeal to this court, plaintiff challenges how the trial judge explained preexisting conditions and the legal concept of proximate causation in the jury charge and verdict sheet. Plaintiff claims defense counsel intentionally misstated the relevant legal principles and distorted the evidence presented at trial in his closing statement to the jury. According to plaintiff, the trial judge misapplied the invited error doctrine in her rulings denying the post-trial motions. Plaintiff argues the judge's legal errors resulted in a manifest denial of justice.

We disagree and affirm. It is undeniable plaintiff was gravely ill during the initial two days of her admission to Monmouth Medical Center. It is also true that misjudgments by a physician caused plaintiff to suffer permanent physical losses in the form of the amputation of both her legs below the knees

4

and her left hand. However, there is ample evidence in the record to support the jury's finding that Dr. Kramer was not negligent in her treatment of plaintiff.

Plaintiff's arguments, which primarily address causation, are not relevant to this dispositive outcome. Even if we were to accept plaintiff's contention that causation was inexorably intertwined with negligence in this case, plaintiff is precluded from challenging the jury instructions and verdict sheet on appeal under the doctrine of invited error. We thus discern no legal or factual basis to disturb the jury's verdict.

## I.

## A.

In March 2011, plaintiff was twenty-nine years old and lived with her mother. She had graduated from Monmouth University with a degree in biology, was tutoring Brazilian children with their homework, and worked for an attorney as an interpreter to assist clients who spoke Portuguese.[1] Plaintiff was also enrolled in a school in the Township of Montclair to be an acupuncturist.

At approximately 4:30 p.m. on March 1, 2011, plaintiff was transported by ambulance to the emergency department at Monmouth Medical Center,

---

[1] Plaintiff was born in Brazil.

complaining of severe pain in the lower left side of her back. Dr. Chester Robert Smialowicz, a defense witness admitted by the court without objection as an expert "in the area of infectious diseases," reviewed the hospital records and described plaintiff's condition and symptoms. Plaintiff reported she had been feverish for over a week and had experienced severe pain for the past two days. Dr. Smialowicz testified that although plaintiff had a history of kidney stones, was feverish, and had "shaking chills" when she arrived at the emergency room, "her vital signs . . . did not meet the criteria for what we call 'sepsis.'"

A CT[2] scan revealed a 2.5-centimeter staghorn calculus (stone) in her left renal pelvis. Her urinalysis also revealed the presence of white blood cells and bacteria. Dr. Michael Esposito, the urologist on call, saw plaintiff on the evening of March 2, 2011, ordered pain medication, intravenous (IV) fluids, and antibiotics. A sample of plaintiff's blood was also collected for culture, and she was thereafter admitted to the general medical floor.

---

[2] "A computerized tomography (CT) scan combines a series of X-ray images taken from different angles around the body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body. CT scan images provide more-detailed information than plain X-rays do." CT Scan, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited Nov. 1, 2021).

A-0880-18

Without objection from defense counsel, plaintiff called Dr. Vijay Seelall as an expert witness in the areas of critical care and pulmonary medicine. She reviewed the hospital records and described to the jury the medical events and steps taken to respond to plaintiff's deterioration. Plaintiff's condition worsened over the next twenty-four hours; her white blood cell count became elevated, and she had a rapid heart rate. The blood cultures taken the night before came back positive, showing gram negative rods, a class of bacteria growing in her bloodstream. It was determined plaintiff's kidney was obstructed and causing an infection in the bloodstream. The decision was made to take plaintiff to interventional radiology for placement of a nephrostomy tube to drain her kidney. The procedure was aborted, however, when she developed rapid respiration and heart rate, and her temperature rose to 104 degrees.

At 11:30 p.m. on March 2, 2011, plaintiff was taken to the operating room where Dr. Esposito performed a cystoscopy and ureteral stent placement. While in the post-operative acute care unit, she became unstable when her blood pressure dropped dangerously low and she went into respiratory failure. She was given several liters of fluids and vasopressors[3] to raise her blood pressure.

---

[3] Vasopressors, a class of drugs, are also sometimes referred to as "pressors" in the record. As Dr. Seelall explained, "[o]ccasionally, sepsis can progress into

A-0880-18

She was intubated and placed on a ventilator. The attending physician consulted with defendant by telephone while plaintiff was still in the post-operative acute care unit. Defendant ordered the attending physician to continue plaintiff on fluids and vasopressors to increase her profoundly low blood pressure.

Around 2:30 a.m. on March 3, 2011, plaintiff was transferred to the ICU where defendant first examined her. While still on a ventilator, plaintiff was receiving IV fluids and three vasopressors -- Neo-Synephrine, vasopressin and dopamine. The handwritten notes prepared by defendant at the time did not document the dosage of the vasopressors nor did they outline any plan for decreasing these medications.[4]

Defendant examined plaintiff again between 8:00 and 8:45 a.m. on March 3, 2011. She noted plaintiff's lung sounds were coarse bilaterally, meaning both lungs were compromised, and a chest x-ray showed pulmonary edema. Plaintiff's white blood cell count was high, which was indicative of infection,

---

septic shock. And what [it] means is that the inflammatory or the inflammation has gotten so severe that you are no longer able to maintain your blood pressure either with fluids or with other treatment options, and so then a person would need to go on pressors or medication to help elevate their blood pressure."

[4] Although the appellate record includes some hand-written medical notes, defendant's notes from 2:30 a.m. on March 3, 2011, if any exist, were not provided.

and her blood lactate level was elevated, indicative of a lack of oxygen perfusion. Defendant diagnosed plaintiff as suffering from bacteremia and septic shock. In her notes, defendant wrote:

> We will follow up the echo report. . . . If she persists in requiring pressors, we would consider moving the central line from the groin to the neck to facilitate assessment of her [central venous pressure (CVP)]. We will continue current pressors with a goal [mean arterial pressure (MAP)] of greater than [sixty-five]. Of note, norephinephrine is not available in this hospital at this time secondary to a shortage nationwide.
>
>     . . . .
>
> We will follow up culture and susceptibilities and adjust antibiotics. Infectious disease consultation is involved and appreciated.
>
>     . . . .
>
> <u>The patient is critically ill. This is discussed at length with the house staff and nursing staff as well as respiratory therapy.</u> The patient was seen [at] 2:30 AM as well as again between 8 and 8:45 AM including review of all data and discussion with other members of the health care team.
>
> Thank you very much for the opportunity to be involved.
>
> [(Emphasis added).]

A-0880-18

The record confirms defendant ordered additional tests and consultations to follow up on plaintiff's abdominal distention, renal failure, septic shock, and blood infection.

At the time defendant treated plaintiff, she was employed as a member of Monmouth Pulmonary Consultants, "a private practice single specialty group." She saw patients in office and attended to patients "both [on] regular medical floors as well as in ICUs in two of the local hospitals." Defendant estimated the nature of her practice in March 2011 "was about [fifty-fifty] pulmonary and critical care[,]" which included seeing patients with sepsis, septic shock, and disseminated intravascular coagulation (DIC).

Defendant turned plaintiff's care over to her partner around 8:00 p.m. on March 4, 2011. Early in the morning of March 5, 2011, plaintiff's family members noticed her left hand was turning blue. Dr. Seelall explained blueness or duskiness in the peripherals, such as the hands, legs, or feet, is called "ischemia." If not reversed, ischemia can lead to tissue death.

Plaintiff was taken into the operating room on March 7, 2011. Two medications were infused directly into her hand to reverse the ischemia: papaverine and tissue plasminogen activator (tPA). Unfortunately, neither proved effective at reversing the ischemia. Plaintiff stayed at Monmouth

A-0880-18

Medical Center for seventeen days. She was transferred to St. Barnabas Hospital in Livingston, New Jersey, where she underwent a series of surgical procedures to save as much of her limbs as possible. Ultimately, saving plaintiff's life required the amputation of her left hand and both legs below the knee.

Plaintiff remained at Saint Barnabas for two months. She was thereafter transferred to the Kessler Rehabilitation Center where she was fitted for prostheses. At the time of trial, plaintiff was living independently but had difficulty completing everyday activities. On direct examination, she described some of the activities she could no longer do or were arduous to accomplish:

> I can't write with my left hand, and I was a lefty, so I can't do that anymore. I can't stand up for more than a minute because my legs hurt, like, stand up still for a minute. I can't go out in the snow when it's snowing, because I can fall and get hurt. I can't do my hair, like, blow dry it or put it up in a ponytail, because I don't have my left hand to do that. I can't tie my shoelaces. It's a simple thing but I can't do that.
>
> . . . .
>
> So, there are many things that I can't do now. I can't wear high heels. I don't do that anymore, so I just wear sneakers because it's more comfortable for me to walk. I can't hold a baby, and that was my dream to have a child.
>
> . . . .

A-0880-18

> I can't continue my acupuncture course that I used to
> do. . . . Because I need both hands to handle the needles
> and everything else that I need to do.

## B.

Plaintiff's counsel called Dr. Seelall to substantiate plaintiff's theory of liability to the jury and to identify and describe the medical events that led to her near-death experience. As Dr. Seelall explained, sepsis is a diffuse inflammatory response to an infection. Sepsis escalates to septic shock when the inflammation becomes so severe the human body can no longer maintain its proper blood pressure. The lack of blood pressure prevents the heart from pumping blood to the lungs and oxygenated blood from reaching the vital organs.

To improve outcomes in patients in septic shock, the first step is to treat the infection with antibiotics. As Dr. Seelall explained, antibiotics can take up to seventy-two hours to take effect. The second step is to provide fluid resuscitation by administering large amounts of IV fluids -- as much as four to six liters in the first six to twelve hours -- to increase the volume of blood reaching the heart. During this time, the patient should be closely monitored to collect data on blood pressure, oxygen saturation, central venous pressure, and cardiac function. If fluids alone are ineffective in elevating the blood pressure,

A-0880-18

the patient "would need to go on pressors or medication to help elevate their blood pressure."

Vasopressors constrict or "squeeze" blood vessels in the hands, legs, and feet, forcing blood back toward the heart. There are several vasopressors on the market. According to Dr. Seelall, Levophed, the brand-named norepinephrine, is the preferred choice because it generally produces the best outcomes. Levophed was not available at the Monmouth Medical Center in March 2011. The hospital had three alternate vasopressors available: Neo-Synephrine, dopamine, and vasopressin. All three were prescribed to plaintiff.

The prolonged use of vasopressors is dangerous, however, because they can cause ischemia. Thus, the treatment goal is always to wean patients off vasopressors as soon as their blood pressure stabilizes. Dr. Seelall testified the generally accepted approach is to maintain a MAP greater than sixty-five, which is the minimum blood pressure necessary to move blood and oxygen to the brain and keep the patient alive. The vasopressor dosage should be reduced if a MAP greater than sixty-five is maintained. Because Dr. Seelall did not find plaintiff's MAPs consistently recorded in her chart, she calculated the MAPs herself from plaintiff's blood pressure readings.

A-0880-18

Using an app on her cellphone, Dr. Seelall calculated the MAP based on the formula MAP = ((2 x diastolic pressure) + systolic pressure)/3. A normal blood pressure of 120/80 would result in a MAP of ninety-three. Based on Dr. Seelall's calculations, plaintiff's MAP values were consistently greater than sixty-five. Most were in the sixty-eight to seventy-two range. Dr. Seelall opined the standard of care required defendant to reduce, or "titrate," the vasopressors and eventually stop them all together. Although plaintiff's chart indicates the vasopressors were reduced, they were not reduced in a timely fashion. In Dr. Seelall's opinion, plaintiff should have been completely off vasopressors by the time defendant turned plaintiff's care over to her partner.

Dr. Seelall also addressed the notes defendant placed in plaintiff's chart on March 3, 2011. She explained that "Is equal to Os" meant the volume of fluid going in should equal the volume of fluid coming out. According to Dr. Seelall, patients in septic shock should be kept on the "positive side," receiving more fluids than they excrete. Based on these data, Dr. Seelall opined defendant was negligent in her management of plaintiff's fluids.

Dr. Seelall acknowledged defendant diagnosed plaintiff with pulmonary edema, i.e., fluid in the lungs resulting in low oxygen levels in the blood stream. She testified fluid commonly accumulates in the lungs of a patient in septic

14

shock because capillaries become "leaky" and excrete excess fluid.  In her opinion, however, pulmonary edema is manageable and not a reason to stop the infusion of fluids.

Dr. Seelall also opined defendant's reference to CVP should have been more closely monitored:

> Q.  During the entire time that [defendant] initially treated [plaintiff] until she turned the care over to her partner . . . did she get the benefit of the CVP rulings -- readings?
>
> A.  No.
>
> Q.  In your opinion, the failure to get the CVP readings, did that breach the standards of care?
>
> A.  Yes.
>
> Q.  And why did it breach the standards of care?
>
> A.  Because that's a valuable piece of information, in terms of how to treat a septic shock patient.
>
> Q.  Let's look at the next line.  "We will continue current pressors with a goal MAP" -- M-A-P -- "of greater than [sixty-five]."  Is that . . . reflective of what you told the jury you're looking for the MAP of [sixty-five]?
>
> A.  Yes.
>
> Q.  And why, again, is that -- is that baseline of [sixty-five], why is that important for the treating critical care doctor in providing good care?  Why?

15

A-0880-18

A. To help with perfusion of the organs.

Q. And if the goal of [sixty-five] is maintained, what then do you do with regard to the pressors?

A. You reduce them.

Q. Okay. And the next line is: "Of note, norepinephrine is not available at this hospital." Is that the Lefamin [sic] you talked about before?

A. That's Levophed.[5]

Dr. Seelall insisted defendant should have ordered plaintiff's CVP be monitored through a central line in the jugular vein in the neck. The line, however, remained in the groin during the time plaintiff was under defendant's care. The record shows there were several unsuccessful attempts by a resident to start a central line in plaintiff's neck. According to Dr. Seelall, defendant's failure to obtain CVP readings deprived her of critical information necessary to care for a septic shock patient. She thus opined defendant breached the standard of medical care. Dr. Seelall admitted, however, there were inherent risks associated with inserting a central line in the neck, e.g., bleeding at the site, potential lung collapse, swelling, and hematoma. The probability of these risks

---

[5] By all accounts, Levophed is a superior medication to treat patients in this condition. The record shows defendant was aware the hospital did not have Levophed at the time.

A-0880-18

occurring increases with every attempt to insert the line. Dr. Seelall nevertheless remained steadfast in her belief that it was defendant's responsibility to obtain CVP readings.

Dr. Seelall also took exception to the lack of peripheral pulse data in defendant's notes. She acknowledged plaintiff's pulses were recorded elsewhere in her chart by ICU nurses who regularly check the patient's extremities for pulse and color. Dr. Seelall nevertheless insisted as "a critical care doctor, you have to do your own exams and document that information yourself." In her opinion, defendant should not have relied on nurses or other medical staff to determine the accuracy of these entries.

Against this backdrop, Dr. Seelall prepared a report in which she identified a total of four deviations from the standard of care in defendant's treatment of plaintiff: (1) inadequate fluid management; (2) lack of vasopressor titration; (3) inadequate peripheral pulse monitoring; and (4) failure to establish appropriate cardiovascular monitoring through insertion of a CVP line. In her opinion, defendant's negligence substantially increased the risk of limb ischemia.

On cross-examination, Dr. Seelall admitted plaintiff had profound septic shock, which carries a mortality rate of approximately forty percent. This makes

17

it the leading cause of death in hospitals. Dr. Seelall stated that if the blood pressure was not supported, and remained low, a patient is likely to die. Finally, Dr. Seelall agreed "that a patient in a severe septic shock can develop gangrene and develop amputations even without any deviation from accepted standards of care . . . ."

C.

At defendant's request, the trial judge admitted Dr. Mitchell Benson as an expert witness in field of urology. As a threshold matter, Dr. Benson explained to the jury the basic structure and function of the human kidneys. Specifically, the doctor explained to the jury meaning and significance of the term "hydronephrosis."

> [It] is an obstruction to the funnel system, the pressure inside the renal pelvis, the funnel of the kidney where the urine is collecting increases. As that pressure increases, it's like trying to blow up a child's balloon. The pressure goes up, the balloon gets bigger.
>
> In this case, the renal pelvis is the balloon. That increases in size as a result of the pressure, and then on an X-ray or a [CT] scan or even visually if you are operating on a kidney, that would show you what is called medically hydronephrosis, which means that this has enlarged in size secondary to obstruction.

Dr. Benson explained plaintiff had an obstruction, which is considered very dangerous to a kidney. Dr. Esposito attempted to resolve the obstruction

18

by inserting a stent. A stent is a tube inserted to a point above the obstruction to relieve the pressure in the kidney. Once the pressure in the kidney is relieved, "the toxic effects of the hydronephrosis can be resolved." Here, plaintiff's obstruction was caused by a staghorn calculus, a stone formed secondary to a urinary tract infection. Staghorn calculi almost always cause an obstruction, and "[a]n obstructed infected kidney can be viewed as a severe abscess."

The obstruction caused the pressure in plaintiff's renal pelvis to rise, which in turn caused bacteria to flow backwards into her kidney, entering her bloodstream. Once bacteria entered the bloodstream, severe sepsis occurred. The blocked kidney could not transmit antibiotics into the urine and the infection worsened. A timely insertion of a stent would have reduced the pressure in the kidney, allowed antibiotics to reach the infection, and stopped bacteria from entering the bloodstream. According to Dr. Benson, "you can never cure a staghorn infected kidney without drainage . . . [t]hat's as basic as it gets in urology education."

Dr. Benson opined that Dr. Esposito, a urologist, "unequivocally deviated from the acceptable standard of care" in his treatment of plaintiff. When plaintiff came to the emergency room, she had symptoms of a serious obstruction. The CT scan showed a blockage causing hydronephrosis and

19

stranding, which meant there was leakage of fluid into the surrounding tissue.

The next morning showed a significant elevation in plaintiff's white blood cell

count. This was a clear, urgent indication that the infection was getting worse.

Plaintiff's kidney needed to be drained.

This prompted the following questions by defense counsel to Dr. Benson:

> Q. Okay. So specifically in terms of Dr. Esposito, on the morning of [March 2, 2011,] what was his specific deviation on the morning of March 2nd?
>
> A. Well, he never checked the white blood count, and this was a patient he was consulted on, so he never checked her status. When that white blood count came in as elevated, he should have recognized in a patient with a staghorn calculus, in a patient with hydronephrosis, in a patient with stranding around the kidney, that was an urgent indication to get that kidney drained, either by putting a stent in or trying to put a tube in through the kidney. Something had to be done to drain that kidney.
>
> Q. Okay. And when you say something had to be done urgently, what sort of time period are you talking about?
>
> A. You'd want to get something done within an hour, perhaps two hours at the outside longest, but this is something that if you're in the operating room, you bump the schedule for. You say my patient is too sick to wait for your operation to be over, this is an urgency that has to go.
>
> Q. Okay. And if Dr. Esposito had drained the kidney in the early morning hours of [March 2, 2011,] do you

> have an opinion as to whether or not this would have made a difference in this patient's outcome?
>
> A.  I'm sorry?  In my opinion, had that been done, her infection would have started resolving.

[(Emphasis added).]

The jury was free to consider Dr. Benson's testimony to determine the magnitude of Dr. Esposito's negligence.  Specifically, the jury could have found Dr. Esposito's failure to follow his patient's status and alleviate the blockage in a timely manner was the key factor that increased the risk of harm to plaintiff.

### D.

Defendant also called Dr. Chester Robert Smialowicz as an expert witness in the "area of infectious diseases."  The trial judge admitted the witness to testify in this capacity without objection from plaintiff's counsel.  As a threshold question, defense counsel asked Dr. Smialowicz if "[he] had experience with patients developing gangrene as a result of infectious diseases?"  He responded: "Unfortunately, I have.  That's a rare condition but I've had those cases also, yes, sir."  Based on his review of plaintiff's medical records, Dr. Smialowicz testified plaintiff did not meet the criteria for sepsis when she arrived at the emergency department on March 1, 2011.  Her blood pressure and respiration were normal, and her temperature was less than 100.4 degrees.  Although her heart rate was

21

elevated, it would be expected from a person who is experiencing severe pain. However, her urinalysis clearly showed an infection.

According to Dr. Smialowicz, the fact that plaintiff's blood culture tested positive for E. coli at noon on March 2, 2011, was a strong reason for concern. Ordinarily, it takes bacteria twenty-four to forty-eight hours to grow in a culture. The rapid growth of this bacteria in less than fifteen hours was indicative of what Dr. Smialowicz said doctors describe as a "hyper-virulent tough guy." Finding bacteria in the bloodstream is "an emergency situation." Antibiotics alone will not suffice for "a big collection of infection like that because it's an abscess." Drainage of the abscessed kidney was required. Unfortunately, drainage did not occur until 11:30 p.m. on March 2, 2011. As Dr. Smialowicz explained:

> Drainage finally occurred about 11:30 p.m. Dr. Esposito came in and I believe you heard this morning that a stent tube was placed up from the bladder, up the ureter, and passed the stone into the kidney to start [d]raining this infection under pressure down the ureter. So, source control finally occurred around 11:30 on the evening of [March 2, 2011].
>
> Q. Okay. And do you happen to remember how long it took Dr. Esposito to do the actual stent?
>
> A. Yeah. Actually, I put it in my report because it was in the operative note. <u>Twelve minutes is all it took him</u>

A-0880-18

> to get that catheter to go up and got right past the stone so it would drain.

[(Emphasis added).]

In the early morning hours of March 3, 2011, plaintiff was taken to the recovery room after the stent was inserted. She soon became unstable and went into septic shock. As her organs started to fail, she was intubated and given fluids and vasopressors to keep her alive. Against this backdrop, defense counsel asked Dr. Smialowicz the following questions:

> Q. Okay. Here's the precise question. Could that circumstance: septic shock, the intubation, the need for pressors, could that have been avoided if Dr. Esposito had drained this patient's obstructed kidney on the morning of [March 2, 2011]?
>
> A. Within reasonable probability, definitely. Yes.
>
> Q. And if Dr. Esposito had drained the kidney by noon, or 2 p.m. on March 2nd, after the blood cultures came, if he had drained the kidney and gotten the obstruction drained, would this patient have gone on to develop septic shock with the need for intubation, the need for pressors in the recovery room?
>
> A. No.

Plaintiff's condition rapidly deteriorated over the next days; her white cell count jumped from 20,000 to 25,000 per microliter of blood. She was in severe septic shock and was receiving three vasopressors to keep her blood pressure

A-0880-18

up. Despite these measures, her systolic pressure remained only at ninety-three. Her temperature had risen to 103.5 degrees and her white blood cell count was at a critical level, with twenty-five percent of those cells being young and immature. The infection process was worsening exponentially.

Even more alarming, plaintiff's platelet count was beginning to fall, indicating bacterial toxins may have been causing blood vessels to clot. As Dr. Smialowicz explained, bacterial infection leading to clotting inside of blood vessels is called "disseminated intravascular coagulation" (DIC). The medical records documented plaintiff was "developing clotting in the small blood vessels in the feet and in the extremity of the left hand."

By the morning of March 5, 2011, plaintiff's left hand appeared dusky and bluish, and by March 6th, her feet were cold and had a poor capillary refill time. Although her circulation continued to worsen, the vasopressors were reduced on March 5th, and completely discontinued on March 6th. By March 8, 2011, plaintiff had developed gangrene. The deterioration of plaintiff's condition at this point in time prompted defense counsel to ask Dr. Smialowicz the following questions:

Q. The patient was on pressors, right?

A. Yes.

A-0880-18

. . . .

Q. And in view of that chronology, vasopressin off on [March 5, 2011] --

A. Dopamine off on the fifth.

Q. Dopamine off on the fifth, the other two pressors off on the sixth, gangrene on the eighth, in your opinion, did the pressors have any contribution to causing the gangrene in this case?

A. No significant contribution at all because DIC was here from the infection and that's -- [eighty-five] percent of the time when you see a patient that has what this unfortunate lady had, called symmetrical peripheral gangrene -- symmetrical meaning two or more extremities. The ends start becoming gangrenous. Peripheral, again means the end of the extremities. Not the trunk of the body. And then the word "gangrene," dead, necrotic, tissue. Symmetrical peripheral gangrene [eighty-five] percent of the time is caused by DIC from an infectious process. And the infectious process is virtually always a toxin-forming bloodstream infection which is exactly what you have here.

As Dr. Smialowicz explained, blood cultures drawn after the kidney was drained showed the antibiotics were effective and bacteria were no longer in her bloodstream. But, E. coli, a type of bacteria, produces toxins that can remain in the human body for several days before being filtered out by the spleen and liver.

25

Even without the presence of bacteria, these toxins can worsen the infectious process and cause multiorgan failure.[6]

Bacterial toxins can also activate the body's coagulation system and cause abnormal clotting. A marker of abnormal clotting is a drop in the number of platelets, which are the cells that stick together to form a clot. Low platelet counts can be an indicator of DIC, a serious complication of a bloodstream infection. In plaintiff's case, her platelet counts fell into the low range on March 4, 2011 and became critically low on March 6th. In retrospect, Dr. Smialowicz noted the duskiness in plaintiff's left hand observed on March 5, 2011, was indicative of platelets coagulating in the small capillaries of the fingers. By March 8th, clotting in the hand and feet progressed to gangrene because no blood was flowing through the clots to keep the tissue alive. Dr. Smialowicz opined, to a reasonable degree of medical certainty, the gangrene of plaintiff's limbs was "definitely" attributable to DIC and to no other cause. The use of vasopressors to treat plaintiff's septic shock may have had some possible effect, but no significant impact on her ultimate outcome.

---

[6] See generally Mervyn Singer et al., Multiorgan Failure is an Adaptive, Endocrine-mediated, Metabolic Response to Overwhelming Systemic Inflammation, Lancet (2004), https://pubmed.ncbi.nlm.nih.gov/15302200/.

A-0880-18

Dr. Smialowicz also explained that there is no way to determine how the vasopressors may have contributed to plaintiff's symmetrical peripheral gangrene. Although vasopressors are intended to keep the body alive during septic shock, they might also aggravate a peripheral perfusion problem. DIC is the cause of peripheral gangrene eighty-five percent of the time. It is beyond dispute, however, that vasopressors do not cause DIC. Here, once the vasopressors were discontinued on March 6, 2011, they would no longer constrict blood vessels nor contribute to lack of circulation in the periphery.

E.

Defendant called Dr. Sean Michael Studer as an expert witness in the field of critical care medicine. After reviewing plaintiff's medical records, Dr. Studer opined plaintiff's gangrene was caused by "disseminated intravascular coagulation, or DIC." Physicians do not know "the details" of what causes DIC; they do not know how to prevent it or "how to fully treat it." It is undisputed, however, that vasopressors do not cause DIC. Normally, when treating DIC, the only approach available to critical care physicians is to support the patient to allow the body to heal itself. Although there is no single test for DIC, clotting cells and platelet counts are "very strong markers" of the condition.

A-0880-18

Dr. Studer opined, within a reasonable degree of medical certainty, that defendant did not deviate from accepted standards of medical care in this case. Defense counsel asked Dr. Studer to describe the acceptable medical protocol for the treatment of septic shock.

> Q. Okay. Again, first of all, just tell the jury what the approach to treating septic shock is, what the basic premises of how to treat septic shock?
>
> A. So, repeating, the three pillars are to control the infection source. One needs to find out where the infection is starting or coming from. And if necessary, address it directly, such as the blockage of the kidney.
>
> Number two is antibiotics. And number three is sustaining or helping maintain the blood pressure. That's done generally with a combination of intravenous fluids, fluids given through an IV, as well as pressors.
>
> . . . .
>
> Fluids are always the first step. Pressors are only used when necessary.
>
> Q. Okay. And what's the decision as to when pressors are necessary? What's . . . the trigger there?
>
> A. The trigger is generally keeping a mean arterial pressure, or a blood pressure, that's adequate to get blood and oxygen to the organs, to the brain, the kidneys, the liver.

28

And so, we refer to that as a MAP. And so, if you cannot maintain, giving the patient fluids rapidly, enough blood pressure, pressors need to be added.

This testimony corroborated the testimony of the other expert witnesses who testified concerning the treatment of septic shock.

In this case, plaintiff received more than seven liters of IV fluids during the initial resuscitation period. Dr. Studer opined the fluid resuscitation was adequate. An x-ray of plaintiff's chest taken on March 3, 2011, showed pulmonary edema in a "bat[-]wing pattern" suggestive of "too much volume in the blood vessels . . . causing it to overflow into the lungs." Plaintiff was "anasaric," meaning swollen over her entire body, and had a high urine output. Defendant's plan consisted of keeping fluid input equal to the output. As Dr. Studer explained,

> when the fluid gets into the lungs, pulmonary edema, as I mentioned, is lung fluid. As it goes in, you can't exchange air through that fluid. And if the lungs become completely filled, if that bat wing becomes just completely white across both lungs, it can't exchange air. They can't get oxygen in. And you can think of it, in general, as drowning from the inside.
>
> Q. So, in your expert opinion, was Dr. Kramer's goal of keeping the input of fluids and the output of fluids equal and appropriate?
>
> A. Yes, at that time it was.

29

A-0880-18

Q. And did that conform to accepted standards of care?

A. Yes, it did.

Dr. Studer also opined defendant's cardiovascular monitoring was appropriate. The echocardiogram performed on March 3, 2011, indicated plaintiff's heart was functioning normally. The bedside monitor displayed her heart rate and blood pressure. In his opinion, defendant's supervision of plaintiff's condition conformed to accepted standards of medical care.

Of particular relevance here, Dr. Studer opined the titration of the pressors was adequate and consistent with accepted medical standards. Plaintiff's chart documented the efforts to lower the dosage of pressors, which began as early as her transition from the post-operative care unit to the ICU. When the pressors were reduced, however, she became unstable, and they needed to be restarted. Dr. Studer nevertheless agreed a critical care doctor must remove pressors as quickly as possible to reduce the risk of extremity loss.

Dr. Studer corroborated Dr. Seelall's testimony that the most important indicator when titrating pressors is MAP, which must be greater than sixty-five to ensure all vital organs are receiving enough blood and oxygen. Dr. Studer was critical of defendant's decision to calculate MAPs using an app on her cellphone. The bedside monitor displays the most accurate value for MAP

30

A-0880-18

because the monitor's computer examines the entire blood pressure cycle and displays a geometric mean value. ICU doctors rely on the MAPs that are displayed on the bedside monitors. It is not possible to maintain a MAP exactly equal to sixty-five, so doctors keep it above that value to protect organs.

Dr. Studer presented a portion of plaintiff's chart to the jury, which showed her MAP was stable and above sixty-five for a few hours when the nurses turned down the pressors. As soon as this occurred, plaintiff's heart rate increased precipitously, her respirations increased, her oxygen saturation decreased, and her blood pressure fell. The pressors were promptly restored to their previous levels.

In Dr. Studer's opinion, plaintiff's ischemia was primarily caused by DIC. His opinion was based in part on the unsuccessful March 7, 2011 efforts to save her hand. By that time, plaintiff was no longer being supported by pressors. Plaintiff was injected with two types of medications in an effort to save her hand. Papaverine and tPA were injected directly into her hand to relax the muscles and break up clots, allowing blood to flow. The fact that the duskiness in her hand did not improve indicated not that the blood vessels were clamped down or closed, as would be the case if the pressors were at fault, but that the ischemia was due to smaller blood clots caused by the DIC.

31

On cross-examination, Dr. Studer conceded, as directed by defendant on March 4, and 5, 2011, the nurses did not take plaintiff's blood pressure readings every five, ten, or even fifteen minutes intervals. Dr. Studer also agreed some tests that could have been ordered were not and documentation in plaintiff's chart was, at times, inadequate. For instance, staff failed to record MAP readings and pulse and extremity checks. Dr. Studer did not waiver, however, in his opinion that defendant had adequate information to properly treat plaintiff.

## II.

Dr. Kramer testified in her own defense. She first saw plaintiff at 2:30 a.m. on March 3, 2011. By this time, Dr. Esposito had completed the cystoscopy and ureteral stent placement. She diagnosed plaintiff as suffering from multiorgan system failure arising from a kidney infection, bacteria in the blood, and septic shock. Thus, by this time, the infection had compromised several major organs of plaintiff's body. Defendant saw plaintiff at 8:45 a.m. on March 3, 2011. The notations in plaintiff's chart indicated she had received more than seven liters of fluid, and was on three vasopressors, Neo-Synephrine, vasopressin, and dopamine.

When plaintiff was first transferred to the ICU, residents attempted to discontinue two of the vasopressors. This caused plaintiff's blood pressure to

A-0880-18

precipitously drop to 69/36. Dr. Kramer explained this was "very dangerously low . . . to a point that most people wouldn't even really be able to interact with you in a very coherent way because there's not enough blood pressure getting to the brain." The nurse and the resident restarted the Neo-Synephrine. They reinstituted the vasopressors and slowly increased the dosages until an adequate blood pressure was achieved.

Defendant checked on plaintiff several times during the day on March 3rd. When she did so, she inspected the pumps infusing medication; looked at the monitors which displayed blood pressure, heart rhythm, oxygen level, and MAP; read the information entered into the chart; and spoke to the nurses. In notes written at 7:00 p.m. that day, she ordered another abdominal ultrasound because she was concerned about plaintiff's liver.

On the morning of March 4, 2011, defendant noted there had been multiple unsuccessful attempts at placing a central line -- a short-term catheter meant to measure blood pressure and deliver fluids, among other things -- directly into the internal jugular vein. Because this procedure carries significant risks, such as potentially collapsing a lung, defendant did not make any further attempts to establish a central line in plaintiff's neck. She also did not order a repeat echocardiogram because she had sufficient data to know plaintiff had "adequate

33

volume resuscitation" and her heart function was normal. At this time, plaintiff's extremities were warm to the touch with no discoloration; her pulse measurements were also normal.

Although plaintiff was still on three vasopressors, her blood pressure was only 93/58. Defendant followed the vasopressor dosages carefully; she checked the bedside pumps, spoke to the nurses about these medications, and reviewed the medication flowsheets. Despite this, the fluid in plaintiff's lungs remained audible and she was still on ventilator support. Plaintiff's blood gases were abnormal but improving. Defendant testified she was concerned plaintiff's platelet count was low, a condition known as thrombocytopenia. She wrote: "possibly . . . secondary sepsis/DIC" and ordered a "DIC panel," a series of blood tests that look for indicators of DIC.

Defendant described plaintiff's condition at the time as "critically ill." She discussed her care with specialists in cardiology, nephrology, infectious disease, nursing, and with "HS," which she defined as shorthand for "house staff." Although she did not write any additional notes in plaintiff's chart, defendant testified she checked on plaintiff's condition throughout the day.

At approximately 8:00 p.m. on Friday March 4, 2011, defendant's partner, Dr. Douglas Livornese, temporarily assumed responsibility for plaintiff's care.

34

The next time defendant saw plaintiff was at 8:30 a.m. on March 7, 2011. Earlier that morning, Dr. Alfonso Ciervo administered tPA and Papaverine in an effort to restore "perfusion," or blood flow, to plaintiff's hand. Defendant noted plaintiff was unresponsive when addressed by name and asked to open her eyes, despite no longer being medically sedated.

In response to her attorney's questions, defendant read to the jury the following entries she made in plaintiff's medical chart:

> Q. And explain to the jury what positive gag means, please.
>
> A. That means that when I took the tube that was going down into her lungs and I moved it back and forth, that she did respond to that, she coughed a little bit and gagged.
>
> Q. Okay. The next entries?
>
> A. So, bilateral toes are cyanotic.[7] That's the change of color. And the left upper extremity fingers are cyanotic.
>
> Q. Okay. And in the times that you'd seen her before [March 7, 2011,] had there ever been cyanotic toes or fingers?
>
> A. There had not.

---

[7] Cyanotic is defined as "marked by or causing a bluish or purplish discoloration (as of the skin and mucous membranes) due to deficient oxygenation of the blood . . . ." Cyanotic, Merriam Webster, https://www.merriam-webster.com/dictionary/cyanotic (last visited Nov. 15, 2021).

A-0880-18

Plaintiff was no longer receiving vasopressors on March 7, 2011. Defendant explained the effects of titrating vasopressors are seen within minutes. At this point, plaintiff's counsel objected to defendant's testimony. In a sidebar discussion with the trial judge, plaintiff's counsel argued: "This is in the nature of general expert testimony . . . of the shelf life of pressors. If he wanted to put it in, he should have put it in through one of his other experts, not through her." Defense counsel argued she should be permitted to describe what she did as a treating physician because "it goes right to her thinking of what's going on with the patient as to how long pressors stay in the body or don't stay in the body." The trial judge overruled plaintiff's counsel's objection. However, she instructed defense counsel to "lay the foundation as to what her basis of that knowledge is . . . ."

> Q. Okay. As a treating physician, do you order pressors for patients from time to time?
>
> A. I do.
>
> Q. And do you actually titrate pressors yourself from time to time?
>
> A. I talk to the residents who write the orders and then I set parameters. The nurses are the ones that actually adjust the pumps.

36

Q. Okay. And in treating the patient and setting these parameters, are you aware of how quickly pressors act on the patient?

A. I am.

Q. Okay. And are you aware of how quickly the pressors stop acting if they're decreased?

A. Yes.

Q. Okay. So, how quickly do pressors have a reaction when you titrate up?

A. Within minutes.

Q. Okay. And how long do pressors have an effect if you titrate down?

A. Also within minutes. They're very short-on, short-off.

Q. And as of [March 7, 2011] the pressors were off completely?

A. That's correct.

There was still fluid in plaintiff's lungs and her white blood cell count was still quite high. A neurologist was consulted when plaintiff became non-responsive to stimuli. An electroencephalogram (EEG) taken that day showed decreased and abnormal brainwave function. A CT scan showed small hemorrhages in the brain. Defendant concluded plaintiff was comatose. A

37

battery of additional tests was ordered. Defendant did not see plaintiff after March 8, 2011.

### III.

### Charge Conference and Jury Instructions

At the Rule 1:8-7(a) charge conference conducted by the court on March 8, 2018, plaintiff's counsel complained the burden of proof charge was tedious and asked the judge to provide the jury with less information, thus making the charge easier to understand. Plaintiff's counsel also agreed with defense counsel that Dr. Esposito had been negligent and his negligence was a proximate cause of plaintiff's injuries. Nevertheless, there was significant disagreement between the attorneys concerning whether the jury should answer any further questions if it found Dr. Kramer was not negligent.

Defense counsel argued the verdict would be complete if the jury found defendant was not negligent. By contrast, plaintiff's counsel insisted the jury was obligated to consider the question of causation and relative fault. This causation argument reemerged at the final charge conference. Ultimately, defense counsel agreed to plaintiff's version of the jury interrogatories.

In its instructions to the jury, the court stated:

> When determining the applicable standard of care, you must focus on accepted standard of practice in critical

A-0880-18

care medicine, and not on the personal subjective belief or practice of Dr. Kramer.

The law recognizes that the practice of medicine is not an exact science. Therefore, the practice of medicine, according to acceptable medical standards, may not prevent a poor or unanticipated result. Therefore, whether the defendant/doctor was negligent depends not on the outcome, but on whether she adhered to or departed from the applicable standard of care.

. . . .

In this case, plaintiff had a [preexisting] condition, an infected kidney stone, which by itself had a risk of causing the plaintiff the harm she ultimately experienced in this case. However, the plaintiff contends that she lost the chance of a better outcome because of the defendant's deviation from accepted standards of medical practice.

Plaintiff contends that Dr. Kramer negligently -- negligently treated her for septic shock, and that the negligent treatment resulted in harm to her.[8]

Judge Zazzali-Hogan provided the jurors with the verdict sheet and explained

it provides you with a roadmap of what issues you need to consider. The sheet has questions that you must consider and answer within the framework of the instructions that I have given you.

---

[8] Plaintiff's lead counsel complimented the court at the end of the charge: "Terrific charge. Thank you."

A-0880-18

. . . .

If during your deliberations you wish to communicate with the [c]ourt, or you would like me to repeat any part of the jury instruction please write your request . . . or question . . . [and] give the note to . . . the attendant. I will respond as quickly as I can by having you come back in the courtroom on the record. I should caution you, however, that at no point until you reach your final verdict should you indicate to the attendant, or anyone else what your vote has been on any question before you. That is a matter that only members of the jury should know until you have reached a final verdict.

During deliberations, the jurors sent out the following question regarding the verdict sheet's Interrogatory No. 7: "What was the [preexisting] condition? A) Kidney stone. B) Sepsis. C) Question mark." The judge discussed the matter with the attorneys. The judge considered the kidney stone and sepsis to be interwoven, since the former led to the latter. Defense counsel suggested the judge should instruct the jurors to rely on their collective recollection of the testimony. Although plaintiff's counsel[9] was initially uncertain about the way to procced, she ultimately agreed the jury should rely on the trial record. The court brought the jury out and the following exchange took place:

COURT:     [Y]ou have to rely on your collective recollections . . . as to what the [preexisting] condition

---

[9] Although plaintiff's lead counsel had left the courtroom on personal business, his co-counsel was present to represent plaintiff in this discussion.

A-0880-18

is or was.  I know that's riveting, but I don't know if I can answer it.

    . . . .

MALE JUROR:  We feel that there may be two [preexisting] conditions for two different doctors.

COURT:  Okay.  Then you need to talk among yourselves and look closely at the way the question is phrased, and if you get stuck I can further direct you, but I don't . . . want you to tell me anything else.

MALE JUROR:  That's all you got?  That's all you got?

COURT:  I know.  I'm sorry.

MALE JUROR:  Terrible.

FEMALE JUROR:  That's okay.

Plaintiff's lead attorney returned to the courtroom nine minutes after this issue with the jury had been resolved.  Counsel nevertheless argued the jury should have been instructed that the relevant "preexisting condition was sepsis and/or septic shock."  Defense counsel stood his ground and reaffirmed the preexisting condition was a factual issue for the jury to determine.  The judge agreed with defense counsel's position, finding that interfering with the jury's deliberations was not appropriate because the preexisting condition could be either a kidney infection and/or septic shock, or both.  The judge remained open

41

to reconsidering if the jury presented a more probing question. The jury ended deliberations for that day without further inquiries.

The record reflects juror number one had previously apprised the judge that he would be unable to deliberate beyond March 15, 2018. Since the jury did not reach a verdict by that date, the judge excused juror number one. The next day Judge Zazzali-Hogan placed on the record that earlier that morning, defense counsel had sent an email to the court, and plaintiff's counsel, requesting the court order the jurors to stop deliberating immediately to permit him the opportunity to explain why the verdict sheet needed to be amended to correct a serious error.

> THE COURT: So, I'm just addressing it head on without [defense counsel], because I don't want to waste time.
>
> PLAINTIFF'S COUNSEL: Yeah.
>
> THE COURT: He sent an e-mail, [defense counsel], at two o'clock this morning. I guess you didn't get it.
>
> PLAINTIFF'S COUNSEL: I didn't look at e-mails really.
>
> . . . .
>
> THE COURT: Okay. [Reading the content of defense counsel's email:] "The verdict sheet is inherently [in]correct, and . . . [t]he jury should stop deliberating until we work it out. There is no proof of a preexisting

42

condition as to Dr. Esposito, which is why the jury had their question. If Dr. Kramer is not negligent, the jury should return their verdict. If Dr. Kramer is negligent, the only allocation should be between Dr. Kramer's negligence and the septic shock admittedly caused by Dr. Esposito. The jury also has to be told why juror number one is no longer participating, and this should be done on the record."

At 8:59 a.m. on March 16, 2018, Judge Zazzali-Hogan addressed the jurors gathered in the courtroom and explained she had excused juror number one due to a previous commitment. The judge explained to the seven remaining jurors that all seven of them must vote upon each question. "However, whenever at least six jurors have agreed to any answer[,] that question has been decided, and you may move to consider the remaining questions in the case if it is appropriate to do so." The judge explained it was not necessary for the same six jurors to agree upon each question's answer. When one of the jurors asked the judge if she could ask a question, the judge responded: "[I]f anybody has a question you need to deliberate as a group and put the question from pen to paper." The judge then appointed juror number two as foreperson of the jury in accordance with Rule 1:8-4. The jury retired to deliberate at 9:02 a.m.

Defense counsel arrived in the courtroom at 9:21 a.m. Judge Zazzali-Hogan apprised defense counsel of the instructions she gave to the seven remaining jurors concerning the absence of juror number one and the need to

43

ask the court a question concerning the case in writing. The judge denied defense counsel's oral motion to stop the jury's deliberations to amend the verdict sheet. Plaintiff's lead counsel agreed with the judge's ruling:

> I don't have a problem. As I said yesterday, I mean, I'm not going to withdraw my position yesterday. I said, from my shoes, if you want to tell them it's sepsis or septic shock, <u>I don't have a problem with that, but if you want to leave it exactly the way it is, it's also fine</u>.
>
> [(Emphasis added).]

### The Jury's Verdict

The seven-member jury returned its verdict on March 16, 2018. The verdict sheet the parties agreed to submit to the jury contained three prefatory questions that stipulated: (1) Dr. Esposito deviated from accepted standards of medical practice; (2) his deviation increased the risk of harm posed by plaintiff's preexisting condition; and (3) the increased risk was a substantial factor in causing the plaintiff's ultimate injury.[10]

In question number four of the verdict sheet, the jury was asked: "Did Dr. Kramer deviate from accepted standards of medical practice?" The foreperson announced the jury's answer was "No" by a vote of six to one. Consistent with the instructions in the verdict sheet, the jury bypassed questions

---

[10] The verdict sheet is attached to this opinion under court Exhibit A.

 A-0880-18

five and six and proceeded to question seven, which asked the jury: "Was some portion of the ultimate injury a result of the [preexisting] condition?" The foreperson announced the jury's answer was "Yes" by a vote of seven to zero. Based on its answer to question seven, the jury proceeded to question eight which asked to: "State in percentages, what portion of the ultimate injury is a result from: (A) The [preexisting] condition. (B) Dr. Esposito's deviation. (C) Dr. Kramer's deviation." The foreperson announced, by a vote of six to one, the jury apportioned responsibility for the ultimate injury: four percent to the preexisting condition; ninety-six percent to Dr. Esposito's deviation; and zero percent to Dr. Kramer.

## IV.

Against this factual backdrop, we now turn to plaintiff's arguments. Plaintiff argues the trial court's jury charge did not properly explain that septic shock was the preexisting condition at the time defendant began to treat her. Plaintiff claims defense counsel improperly merged fault and proximate cause in his opening statement to the jury and blamed the deterioration of her condition on Dr. Esposito, the urologist. According to plaintiff, the court was required to make clear to the jury there were two different preexisting conditions. Plaintiff argues the prejudice caused by the trial judge's failure to clarify the preexisting

A-0880-18

conditions was manifested when the jury sent out a question during deliberations asking for clarification on this precise issue.

Defendant argues plaintiff's attempt to impeach the reliability of the verdict based on an alleged confusion as to preexisting conditions is moot because the jury found Dr. Kramer did not deviate from acceptable standards of medical care in her treatment of plaintiff. We agree.

In a straightforward medical malpractice action, a plaintiff has the burden to prove the relevant standard of care governing defendant-physician, a deviation from that standard, injury proximately caused by the deviation, and damages suffered from the doctor's negligence. Komlodi v. Picciano, 217 N.J. 387, 409 (2014) (citing Evers v. Dollinger, 95 N.J. 399, 406 (1984)). In a Scafidi[11] case, a plaintiff must prove the physician who negligently treats a patient with a preexisting disease increased the harm caused by the preexisting disease and this increased risk of harm is attributable to the physician's negligent conduct. Here, the jury found Dr. Kramer's treatment of plaintiff's preexisting condition did not deviate from the acceptable standard of care. The jury found ninety-six percent of plaintiff's harm was caused by Dr. Esposito and the

---

[11] Scafidi v. Seiler, 119 N.J. 93 (1990).

A-0880-18

remaining four percent of harm was caused by plaintiff's preexisting condition. Thus, the jury correctly adhered to the court's <u>Scafidi</u> instructions and found Dr. Kramer was not responsible for plaintiff's ultimate injury.

Plaintiff moved for an JNOV under <u>Rule</u> 4:40-2 or alternatively for a new trial pursuant to <u>Rule</u> 4:49-1(a) arguing, for the first time in this lengthy complex case, "that there were two competing preexisting conditions: (1) the infected kidney stone as it related to the care rendered by Dr. Esposito and (2) septic shock related to the condition of plaintiff when Dr. Kramer took over her care on March 3, 2011." After meticulously reviewing the record developed by plaintiff's counsel before the jury, including both the opening statement and closing argument, and the issues discussed and agreed to at the charge conference, Judge Zazzali-Hogan denied plaintiff's post-verdict motions. The judge explained her decision in a carefully written, well-reasoned fifty-page memorandum of opinion.

It would be inappropriate for this court to attempt to summarize Judge Zazzali-Hogan's comprehensive review of the record and equally wide-ranging analysis of the legal principles that governed her decision. We are compelled to note, however, the judge's commitment to the principles of fundamental fairness and justice under law are evident not only in her scholarship but in her

47

willingness to give due consideration to plaintiff's counsel's multiple unauthorized supplemental submissions.

On appellate review of a trial court's denial of a motion for JNOV, "we 'must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence].'" Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 572 (2010) (alteration in original) (quoting Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998)). In light of the extensive record developed before the jury in this trial, we discern no legal grounds to overturn this verdict.

We next address the trial court's denial of plaintiff's motion for a new trial. It is well-settled that an "appellate court will not reverse a trial court's determination of a motion for a new trial 'unless it clearly appears that there was a miscarriage of justice under the law.'" Delvecchio v. Township of Bridgewater, 224 N.J. 559, 572 (2016) (quoting R. 2:10-1). In deciding a motion for a new trial, the trial judge "takes into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called 'demeanor evidence', and the intangible 'feel of the case' which he [or she] has gained by presiding

over the trial." Dolson v. Anastasia, 55 N.J. 2, 6 (1969). "The trial judge shall grant the motion, if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly appears that there was a miscarriage of justice under the law." Id. at 7; see Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). Stated differently, a jury verdict must stand unless there is undeniable evidence of a clear injustice. Little v. KIA Motors Am., Inc., 425 N.J. Super. 82, 92 (App. Div. 2012).

Here the jury verdict was not a miscarriage of justice. Dr. Seelall, plaintiff's expert witness, supported plaintiff's claim of negligence. Plaintiff's counsel argued to the jury that defendant deviated from accepted standards of care by not giving plaintiff adequate fluids, not properly monitoring her peripheral pulses and cardiovascular system, and not reducing the vasopressors sooner. Defense counsel argued Dr. Kramer adhered to the standard of care applicable to her role in this case. Tragically, plaintiff's gangrene developed as the result of DIC, which arose from the underlying bacterial infection. The jury assessed the credibility of the witnesses and the plausibility of the attorneys' arguments when it decided defendant did not deviate from the relevant standard of reasonable medical care. The record contains sufficient evidence to support

49

the jury's verdict. There is no basis to conclude, as a matter of law, that this verdict constitutes a miscarriage of justice.

Finally, we address the doctrine of invited error. Our Supreme Court has held:

> "The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." . . . "[A] defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought . . . claiming it to be error and prejudicial." The doctrine of invited error "is based on considerations of fairness and preservation of the integrity of the litigation process."
>
> [N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340-41 (2010) (internal citations omitted).]

A litigant who "induced, encouraged or acquiesced in or consented to" a position during trial is barred from repudiating this approach on appeal. State v. Corsaro, 107 N.J. 339, 345 (1987) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). Here, the record shows plaintiff's counsel unequivocally "acquiesced in or consented to" Judge Zazzali-Hogan's decision to deny defense counsel's oral motion to stop the jury's deliberations to amend the verdict sheet. Plaintiff's counsel also accepted the jury charges. This

50

requires no further elaboration.  Plaintiff's remaining arguments lack sufficient

merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0880-18

PEREIRA V. ESPOSITO, ET AL.
Docket No. MON-L-1397-12

## VERDICT SHEET

1. Did Dr. Esposito deviate from accepted standards of medical practice?

   Yes  X    If your answer is "Yes" proceed to question 2.

   No  _____  **If your answer is "No" return your verdict for the defendant.**

2. Did Dr. Esposito's deviation from accepted standards of medical practice increase the risk of harm posed by the plaintiff's pre-existing condition?

   Yes  X    If your answer is "Yes" proceed to question 3.

   No  _____  If your answer is "No" return your verdict for the defendant.

3. Was the increased risk a substantial factor in causing the Plaintiff's ultimate injury?

   Yes  X    If your answer is "Yes" proceed to question 4.

   No  _____  If your answer is "No" return your verdict for the defendant.

4. Did Dr. Kramer deviate from accepted standards of medical practice?

   Yes_____  If your answer is "Yes" proceed to question 5.

   No  _____  If your answer is "No" proceed to question 7.

   Vote:_____

5. Did Dr. Kramer's deviation from accepted standards of medical practice increase the risk of harm posed by the plaintiff's pre- existing condition?

   Yes  _____  If your answer is "Yes" proceed to question 6.

   No  _____  If your answer is "No" proceed to question 7.

   Vote:_____